**19-cv-3911 (VSB)**
**(Administratively Consolidated)**
**This document applies to all Administratively Consolidated Appeals**

# United States District Court

*for the*

# Southern District of New York

---

FAIRFIELD SENTRY LIMITED (IN LIQUIDATION), acting by and through the Foreign Representatives thereof, KENNETH KRYS and GREIG MITCHELL, solely in their capacities as Foreign Representatives and Liquidators thereof,

*Plaintiffs-Appellants,*

v.

CITIBANK NA LONDON,

*Defendant-Appellee.*

---

*On Appeal from the United States Bankruptcy*
*Court for the Southern District of New York*

## PLAINTIFFS-APPELLANTS' OPENING BRIEF

SELENDY & GAY PLLC
DAVID ELSBERG
CAITLIN J. HALLIGAN
ANDREW R. DUNLAP
LENA KONANOVA
JORDAN GARMAN
1290 Avenue of the Americas
New York, New York 10104
(212) 390-9000
delsberg@selendygay.com
challigan@selendygay.com
adunlap@selendygay.com
lkonanova@selendygay.com
jgarman@selendygay.com

BROWN RUDNICK LLP
DAVID J. MOLTON
MAREK P. KRZYZOWSKI
Seven Times Square
New York, New York 10036
(212) 209-4800
dmolton@brownrudnick.com
mkrzyzowski@brownrudnick.com

*Attorneys for the Plaintiffs-Appellants Foreign Representatives*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Federal Rule of Bankruptcy Procedure 8012, Kenneth M. Krys and Greig Mitchell, in their capacities as liquidators and foreign representatives of Fairfield Sentry Limited (in liquidation) ("<u>Sentry</u>"), Fairfield Sigma Limited (in liquidation) ("<u>Sigma</u>"), and Fairfield Lambda Limited (in liquidation) ("<u>Lambda</u>"), hereby state that Sentry, Sigma, and Lambda have no parent corporation, and there is no publicly held corporation owning ten percent (10%) or more of the shares of Sentry, Sigma, or Lambda.

Date: December 10, 2019      SELENDY & GAY PLLC

*/s/ David Elsberg*
David Elsberg
Caitlin J. Halligan
Andrew R. Dunlap
Lena Konanova
Jordan Garman
1290 Avenue of the Americas
New York, NY 10104
Telephone: 212-390-9000
delsberg@selendygay.com
challigan@selendygay.com
adunlap@selendygay.com
lkonanova@selendygay.com
jgarman@selendygay.com

-and-

BROWN RUDNICK LLP
David J. Molton
Marek P. Krzyzowski
Seven Times Square
New York, NY 10036
Telephone: 212-209-4800
dmolton@brownrudnick.com
mkrzyzowski@brownrudnick.com

*Attorneys for the Plaintiffs-
Appellants Foreign
Representatives*

## TABLE OF CONTENTS

Statement of Jurisdiction.................................................................1

Issues Presented............................................................................2

Standard of Appellate Review.......................................................3

Preliminary Statement ...................................................................4

Statement of the Case ....................................................................9

    A.    The Funds....................................................................11

    B.    Citco Fraudulently And Dishonestly Determined The Funds' Net Asset Values ........................................ 13

    C.    The BVI Redeemer Actions.....................................17

    D.    The U.S. Redeemer Actions ....................................21

    E.    The Decision Below ................................................25

Summary of Argument..................................................................28

Argument.......................................................................................31

I.    *WEAVERING II* AUTHORIZES THE LIQUIDATORS' AMENDED COMMON LAW CLAIMS ......................................31

    A.    Under *Weavering II*, Net Asset Values Determined Fraudulently Or Dishonestly By An Investment Fund's Authorized Agent—As Here, By Citco—Are Not Binding ...................................................................... 33

    B.    Under *Weavering II*, BVI Common Law Authorizes The Liquidators To Recover Inflated Redemption Payments Based On Citco's Fraudulent And Dishonest NAV Determinations For The Benefit Of All Creditors................39

C.   Even If *Weavering II* Did Not Control, The Bankruptcy Court Erred In Partially Denying The Liquidators Leave To Amend Their Common Law Claims ..................... 43

1.   Under The Plain Language Of The Funds' Articles, Net Asset Values Determined In Bad Faith Are Not Binding ................................................................. 44

2.   The Liquidators May Recover Inflated Redemption Payments Based On Non-Binding, Bad Faith Net Asset Values To Benefit The Funds' Non-Redeeming Shareholders .................................... 50

3.   There Are No Other Barriers To The Liquidators' Recovery ................................................................. 55

II.   *WEAVERING II* AUTHORIZES THE LIQUIDATORS' AMENDED CONTRACT CLAIMS ................................................. 57

III.   BECAUSE THE LIQUIDATORS MAY AMEND THEIR COMPLAINTS, THE BANKRUPTCY COURT'S DISMISSAL OF THEIR PRIOR COMPLAINTS IS MOOT ............................. 60

Conclusion ........................................................................... 61

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Bacolitsas v. 86th & 3rd Owner, LLC,*
  702 F.3d 673 (2d Cir. 2012) ........................................................... 4, 39

*Baker v. Dorfman,*
  239 F.3d 415 (2d Cir. 2000) ........................................................... 4, 39

*In re Bernard L. Madoff Inv. Sec. LLC,*
  654 F.3d 229 (2d Cir. 2011) ............................................................... 3

*City of Pontiac Gen. Emps.' Ret. Sys. v. MBIA, Inc.,*
  637 F.3d 169 (2d Cir. 2011) ............................................................. 33

*Davis v. Shah,*
  821 F.3d 231 (2d Cir. 2016) ........................................................... 4, 39

*In re Fairfield Sentry Ltd.,*
  596 B.R. 275 (Bankr. S.D.N.Y. 2018) . 11, 17, 21, 22, 25, 26, 27, 32, 39,
  45, 46, 47, 48, 51, 53, 54, 55, 57, 58

*In re Fairfield Sentry Ltd.,*
  No. 10-13164 (SMB), 2018 WL 3756343 (Bankr. S.D.N.Y. Aug. 6,
  2018) ................................................................................................. 1

*Flores-Figueroa v. United States,*
  556 U.S. 646 (2009) ........................................................................ 51

*Joint Stock Co. v. Infomir LLC,*
  No. 16-cv-1318-GBD-BCM, 2017 WL 2988249 (S.D.N.Y. Mar. 27,
  2017) ............................................................................................... 60

*In re Maxwell Commc'n Corp. plc by Homon,*
  93 F.3d 1036 (2d Cir. 1996) .............................................................. 3

*Michael Miller Fabrics, LLC v. Studio Imports Ltd., Inc.*,
No. 12-cv-3858-KMW-JLC, 2012 WL 4513546 (S.D.N.Y. Oct. 1, 2012)
.................................................................................................. 60

*Orlander v. Staples, Inc.*,
802 F.3d 289 (2d Cir. 2015) .............................................................. 60

*Rogers v. White Metal Rolling & Stamping Corp.*,
249 F.2d 262 (2d Cir. 1957) .............................................................. 33

*Roller Bearing Co. of Am. v. Am. Software, Inc.*,
570 F. Supp. 2d 376 (D. Conn. 2008) ................................................ 60

*Thea v. Kleinhandler*,
807 F.3d 492 (2d Cir. 2015) ................................................................ 3

*Troice v. Proskauer Rose, LLP*,
816 F.3d 341 (5th Cir. 2016) ............................................................. 33

*Vandenbark v. Owens-Illinois Glass Co.*,
311 U.S. 538 (1941) ........................................................................... 33

*Williams v. N.Y. State Unified Court Sys. Office of Court Admin.*,
No. 16-cv-2061 (VSB), 2017 WL 4402562 (S.D.N.Y. Sept. 30, 2017) . 60

**International Cases**

*Aiken v. Short*
[1856] 1 H. & N. 210 ......................................................................... 56

*Arnold v. Britton*
[2015] UKSC 36 ......................................................................... 44, 48

*Aspect Contracts (Asbestos) Ltd. v. Higgins Constr. Plc*
[2015] UKSC 38 ................................................................................ 58

*Attorney General of Belize v. Belize Telecom Ltd.*
[2009] UKPC 10 ................................................................................ 58

*Attorney General v. River Dorée Holdings Ltd.*
[2017] UKPC 39 ................................................................................ 45

*Balfour Beatty Reg'l Constr. Ltd. v. Grove Devs. Ltd.*
    [2016] EWCA (Civ) 990.................................................................. 48, 49

*Barnardo's v. Buckinghamshire*
    [2018] UKSC 55 ................................................................................ 49

*Carillion Constr. Ltd. v. Emcor Eng'g Servs. Ltd.*
    [2017] EWCA (Civ) 65.................................................................. 48, 49

*DD Growth Premium 2X Fund (In Official Liquidation) v. RMF Mkt. Neutral Strategies (Master) Ltd.*
    [2017] UKPC 36 .......................................................................... 25, 47

*Derry v. Peek*
    [1889] 14 App. Cas. 337 (HL) ..................................................... 34, 38

*Fairfield Sentry Ltd. (In Liquidation) v. Bank Julius Baer & Co.,*
    Nos. BVIHC (COM) 30/2010, et al.................................................... 19

*Fairfield Sentry Ltd. (in Liquidation) v. Migani*
    [2014] UKPC 9 ................................................... 19, 20, 21, 25, 46, 56

*Jetivia SA v. Bilta (UK) Ltd. (in Liquidation)*
    [2015] UKSC 23 ............................................................................... 53

*Kingate Global Fund Ltd. (In Liquidation) v. Kingate Mgmt. Ltd.*
    [2015] SC (Bda) 65 Com.............................................................. 47, 54

*Marks & Spencer plc v. BNP Paribas Secs. Servs. Tr. Co. (Jersey) Ltd.*
    [2015] UKSC 72 ............................................................................... 59

*Pearson v. Primeo Fund*
    [2017] UKPC 19 ............................................................................... 48

*Quilvest Fin. Ltd. v. Fairfield Sentry Ltd. (in Liquidation),*
    Nos. HCVAP 2011/041, et al............................................................ 19

*Royal Brunei Airlines v. Tan*
    [1995] 2 A.C. 378 (PC) ................................................................ 34, 38

*Skandinaviska Enskilda Banken AB (Publ) v. Conway (as Joint Official Liquidators of Weavering Macro Fixed Income Fund Ltd.)*
[2016] CICA No. 2 of 2016 .......................................... 25, 35, 47, 53, 54

*Skandinaviska Enskilda Banken AB (Publ) v. Conway (as Joint Official Liquidators of Weavering Macro Fixed Income Fund Ltd.)*
[2019] UKPC 36....7, 21, 32, 34, 35, 36, 37, 38, 40, 41, 42, 43, 47, 50, 53, 57, 59

*Three Rivers Dist. Council v. Bank of England (No. 3)*
[2003] 2 A.C. 1 (HL) ....................................................................... 34, 38

*Trillium (Prime) Prop. GP Ltd. v. Elmfield Road Ltd.*
[2018] EWCA (Civ) 1556....................................................................... 49

*Wood v. Capita Ins. Servs. Ltd.*
[2017] UKSC 24 .................................................................... 44, 45, 48

## Federal Statutes

28 U.S.C. § 158(a)(1)................................................................................ 1

28 U.S.C. § 1334(b) ................................................................................ 1

## International Statutes

BVI Business Companies Act, 2004 § 31 ............................................... 55

## Other Authorities

Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts (West 2012) ................................................................... 51

Black's Law Dictionary (11th ed. 2019)................................................. 51

Graham Virgo, *Good Consideration Provided by the Defendant*, The Principles of the Law of Restitution (3d ed. 2015)....................... 21, 56

Kim Lewison, *Party not to Take Advantage of Own Wrong*, The Interpretation of Contracts (6th ed. 2015) ......................................... 54

Lincoln Caylor & Martin S. Kenney, In Pari Delicto *and* Ex Turpi
Causa: *The Defence of Illegality – Approaches Taken in England and
Wales, Canada and the US*
18 Bus. L. Int'l 259 (2017) ........................................................... 50, 53

Lord Jonathan Sumption, *A Question of Taste: The Supreme Court and
the Interpretation of Contracts*, Harris Society Annual Lecture, Keble
College, Oxford (May 8, 2017) ............................................................ 47

Robert Goff & Gareth Jones, *Good Consideration*, The Law of Unjust
Enrichment (9th ed. 2016) ........................................................... 21, 56

## **STATEMENT OF JURISDICTION**

The Bankruptcy Court had jurisdiction under 28 U.S.C. § 1334(b), as the adversary proceedings below and the claims asserted by the Plaintiffs-Appellants, at minimum, relate to the Chapter 15 case of the above-captioned Debtors, *In re Fairfield Sentry Ltd., et al.*, No. 10-13164 (SMB), pending in the Bankruptcy Court. *In re Fairfield Sentry Ltd.*, No. 10-13164 (SMB), 2018 WL 3756343, at *8 (Bankr. S.D.N.Y. Aug. 6, 2018). This Court has jurisdiction pursuant to 28 U.S.C. § 158(a)(1). Final orders were entered in the Bankruptcy Court between April 2, 2019 and April 18, 2019. *See* Addendum A. The notices of appeal were timely filed between May 1, 2019 and May 16, 2019 after an extension of time to do so was granted by each final order. *Id.*; *see, e.g.*, Apr. 15, 2019 Order of Dismissal (No. 10-ap-03496 (SMB) (Bankr. S.D.N.Y.) Dkt. 2066 at 9).

## ISSUES PRESENTED

1.  *Weavering II* held that net asset values ("NAVs") determined fraud-
    ulently or dishonestly by an investment fund's authorized agent are
    not binding, and fund liquidators may recover redemption pay-
    ments that were based on such NAVs.  Ruling before *Weavering II*,
    the Bankruptcy Court held that such NAVs are binding and liqui-
    dators cannot recover related redemption payments, and thus de-
    nied Plaintiffs-Appellants leave to amend their common law claims
    to allege fraud and dishonesty by an authorized agent in determin-
    ing NAVs.  Should the Bankruptcy Court's decision be reversed?

2.  *Weavering II* held that any need for finality in determining NAVs
    "must yield" when NAVs are determined fraudulently or dishon-
    estly by a fund's authorized agent, and that liquidators may recover
    redemption payments based on such NAVs.  Ruling before *Weaver-
    ing II*, the Bankruptcy Court held that such NAVs are final after
    redemption payments based on those NAVs are made, and thus de-
    nied Plaintiffs-Appellants leave to amend their contract claims to
    allege an implied contract term that requires repayment of

redemption payments based on such NAVs.  Should the Bankruptcy Court's decision be reversed?

3.   After denying Plaintiffs-Appellants' motion to amend most of their claims, the Bankruptcy Court dismissed certain unamended claims.  If the Bankruptcy Court's decision denying leave to amend is reversed, and the proposed amended claims can proceed, should the Bankruptcy Court's decision dismissing those claims be vacated and the case remanded with instructions to deny the dismissal motion as moot?

## STANDARD OF APPELLATE REVIEW

This Court reviews the Bankruptcy Court's legal conclusions *de novo*.  *In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d 229, 234 (2d Cir. 2011).  Because the Bankruptcy Court denied leave to amend based on futility, this Court reviews that decision *de novo*.  *Thea v. Kleinhandler*, 807 F.3d 492, 496 (2d Cir. 2015) ("Where the denial of leave to amend is based on the resolution of legal questions … a reviewing court conducts a *de novo* review.") (quotation marks omitted).  This Court reviews the Bankruptcy Court's decision to dismiss claims *de novo*.  *In re Maxwell Commc'n Corp. plc by Homan*, 93 F.3d 1036, 1044 (2d Cir. 1996).

Finally, appellate courts may exercise their discretion to resolve issues not decided below when (1) the issues are purely legal and require no additional factfinding, *Baker v. Dorfman*, 239 F.3d 415, 420 (2d Cir. 2000); (2) resolving them would best serve judicial economy, *Bacolitsas v. 86th & 3rd Owner, LLC*, 702 F.3d 673, 681 (2d Cir. 2012); (3) resolving them would not prejudice the opposing party, *Davis v. Shah*, 821 F.3d 231, 246 (2d Cir. 2016); or (4) a party has asserted the claim earlier in the proceedings, *id.*

## PRELIMINARY STATEMENT

This appeal concerns fraud and dishonesty by an investment fund administrator that resulted in billions of dollars of overpaid redemptions. Citco Fund Services (Europe) B.V. (together with affiliates, "Citco")[1] administered Fairfield Sentry Limited ("Sentry"), Fairfield Sigma Limited ("Sigma"), and Fairfield Lambda Limited ("Lambda") (collectively, the "Funds"), which invested substantially all their investors' assets in Bernard L. Madoff Investment Securities ("BLMIS"). The Funds' directors gave Citco authority to calculate the Funds' net asset values ("NAVs"),

---

[1] An alphabetized table of defined terms is included in Addendum B.

4

which were the basis for redemption payments made to investors who redeemed shares in the Funds.

Citco betrayed the Funds' trust for its own profit.  As early as 2000—nearly a decade before Bernard L. Madoff confessed that BLMIS was a Ponzi scheme—Citco expressly suspected that BLMIS was a fraud. Believing Madoff's supposed investment returns were too good to be true, Citco tried to verify the existence of the Funds' assets at BLMIS at least three separate times over several years but could not do so.  Indeed, Citco thought the Funds' investments in BLMIS were so risky that it shut down its own credit relationships with them.

Even though Citco believed the Funds' investments were likely not worth what Madoff claimed, it continued to determine the Funds' NAVs based on BLMIS's phony returns, pursuant to its delegated authority. Citco's conduct led the Funds to make highly inflated redemption payments at the same time that, egregiously, Citco was raking in exorbitant fees correlated to the very same fabricated NAVs it was calculating. Citco's bad faith acts—which, as alleged, must be taken as true for purposes of this appeal—constitute fraud and dishonesty independent of Madoff's.

Citco's fraud and dishonesty benefited Defendants-Appellees.[2] Those investors cashed in shares of the Funds before Madoff confessed and received grossly inflated redemption payments, based on Citco's bad faith NAVs, that they refuse to give back.  Plaintiffs-Appellants, the Funds' liquidators (the "Liquidators"), seek to recover those inflated payments so they can equitably distribute the money to the Funds' creditors under the insolvency law of the British Virgin Islands ("BVI")—including to those investors who did not redeem their shares and lost nearly their entire investments when Madoff's scheme was revealed.  The Liquidators filed suits to recover those inflated redemption payments from redeeming shareholders in the BVI and the United States, beginning in 2009.

After the Liquidators obtained evidence of Citco's wrongful acts in 2014, they sought leave to amend their common law restitution and contract claims in the Bankruptcy Court to allege such bad faith.

---

[2] The lead case, *Fairfield Sentry Limited (In Liquidation) et al. v. Citibank NA London*, No. 19-cv-03911 (VSB) (S.D.N.Y.), is consolidated with 237 other appeals listed in Addendum A.  *See* Aug. 20, 2019 Order & Ex. A (No. 19-cv-03911 (VSB) (S.D.N.Y.) Dkt. 5).  Unless otherwise noted, docket citations refer to the consolidated adversary proceeding docket below, *Fairfield Sentry Ltd. (In Liquidation), et al. v. Theodoor GGC Amsterdam, et al.*, No. 10-ap-03496 (SMB) (Bankr. S.D.N.Y.), and page citations refer to ECF pagination.

Misapplying BVI law, the Bankruptcy Court held that notwithstanding Citco's fraud and dishonesty, the NAVs at issue were final once Defendants-Appellees received their redemption payments, and thus the Liquidators could not recover the correspondingly inflated redemption payments.  On that basis, the court denied leave to amend and granted Defendants-Appellees' motion to dismiss those claims, except against defendants who allegedly knew the NAVs were inaccurate at the time of redemption.

Since the Bankruptcy Court's decision, the Judicial Committee of the Privy Council in London (the "Privy Council")—the highest court for the BVI and other British Overseas Territories—issued new controlling law that requires reversal of the decision below.  In *Skandinaviska Enskilda Banken AB (Publ) v. Conway (as Joint Official Liquidators of Weavering Macro Fixed Income Fund Ltd.)* [2019] UKPC 36 ("*Weavering II*"), the Privy Council made clear that when NAVs are determined by the dishonesty or fraud of a fund's duly authorized representative, NAVs that would otherwise be binding are *not* in fact binding and public policy requires that fund liquidators be able to recover inflated redemption payments based on such NAVs.  *Weavering II* is dispositive here,

7

where Citco, the Funds' duly authorized administrator, fraudulently and dishonestly determined the relevant NAVs, resulting in billions of dollars of inflated redemption payments to Defendants-Appellees—to the detriment of the Funds' other investors.

Even if *Weavering II* did not control (it does), the Bankruptcy Court's decision was erroneous given the plain language of the Funds' Articles of Association. These Articles protect investors against internal fraud and dishonesty by providing that NAVs are binding only if accompanied by a certificate given "in good faith" by or on behalf of the Funds' Directors. Because Citco gave the relevant certificates on behalf of the Directors in bad faith, the NAVs here are not binding, and the Liquidators can recover the correspondingly inflated redemption payments. The Bankruptcy Court's decision to the contrary gutted this important, express investor protection, failing to adhere to long-standing principles of BVI contract interpretation law and policy.

The Bankruptcy Court's decision cannot stand. It is inconsistent with clear Privy Council authority. It frustrates the objectives of BVI law, which favor remedying harm to investors who suffer as the result of a fund's internal fraud or dishonesty. And it rewards Defendants-

8

Appellees for profiting from Citco's fraud and dishonesty, allowing them to keep at least $1.9 billion to which they are not entitled.

Reversal is required.

## STATEMENT OF THE CASE

For decades, Bernard L. Madoff ran the largest Ponzi scheme in history. Holding out BLMIS as an investment fund, Madoff falsified trading records to create the illusion of large investment returns. In reality, all redemptions that BLMIS paid to existing investors came from investments placed with BLMIS by new investors. As with all Ponzi schemes, once the money leaving the fund exceeded the money coming into it, the scam collapsed. This appeal concerns investors in the Funds, which in turn invested substantially all their assets in BLMIS.

Defendants-Appellees are investors in the Funds who redeemed shares before Madoff's fraud was revealed and the Funds were put into liquidation. They exchanged shares in the Funds for redemption payments calculated based on the Funds' stated NAVs—determined by Citco, the Funds' authorized agent—which at the time reflected BLMIS's fictitious returns. In reality, of course, the true NAVs of the Funds were nearly worthless and the investors' redemption payments should have

been near zero.  Nevertheless, Defendants-Appellees refuse to return the inflated redemption payments they received.

Plaintiffs-Appellants Kenneth Krys and Greig Mitchell are the Funds' liquidators, *see* Oct. 2, 2019 Notice of Change of Status (No. 19-cv-03911 (VSB) (S.D.N.Y.) Dkt. 12), who seek to recover the inflated over-payments based on these fraudulent and dishonest NAVs so they may equitably distribute the money to all creditors pursuant to the BVI insolvency regime, including to investors who did not redeem their shares before the Funds were liquidated.  Non-redeeming investors lost all or most of such investments in the Funds once Madoff's scam collapsed.

The Liquidators allege that Citco—which had actual authority to determine NAVs and issue redemption payments—suspected Madoff's malfeasance for years, but turned a blind eye to it, continuing to determine NAVs based on BLMIS's fictitious returns.  Citco's bad faith benefited investors who redeemed before Madoff's scam was revealed, because Citco's fraudulent and dishonest determination of the NAVs led to redeeming investors receiving a windfall of correspondingly inflated redemption payments.

10

The Bankruptcy Court partially denied the Liquidators leave to amend their existing complaints to add allegations of Citco's bad faith to their existing common law restitution and contract claims. The court then dismissed the claims that it did not allow to be amended. On appeal, the Liquidators seek reversal of those rulings based on intervening controlling law and, alternatively, based on the Bankruptcy Court's error.

## A.    The Funds

Sentry was BLMIS's largest feeder fund, with over 95% of its assets invested in BLMIS.  Oct. 21, 2016 Decl. of David J. Molton ("Molton Decl.") (Dkt 942 at 225 (¶ 2)); Oct. 21, 2016 Decl. of William Hare ("Hare Decl.") (Dkt 925 ¶ 9).  Sigma and Lambda were "funds of funds" that invested all their assets in Sentry. *See* Hare Decl. (Dkt. 925 ¶ 9).

Organized under the laws of the BVI, *id.* ¶ 8, the Funds were governed by their respective Articles of Association, *In re Fairfield Sentry Ltd.*, 596 B.R. 275, 283 (Bankr. S.D.N.Y. 2018) (Dkt. 1743 at 5) ("*Fairfield II*"), which were substantially identical for all three Funds in all material respects, Hare Decl. (Dkt. 925 ¶ 10(a)).

Article 10 authorized the Funds to redeem shares at a "Redemption Price," Oct. 10, 2003 Articles of Association ("Articles") (Dkt. 925-6

11

§ 10(1)(b)), defined as "the Net Asset Value per Share (as determined in accordance with Article 11)" as of the close of the relevant business day. *Id.* § 10(2). To determine a NAV, Article 11 provided a formula that divided the Funds' net assets by its issued shares, with a few adjustments. *Id.* § 11(1).[3] Central to the issues on appeal, Article 11(1) provided: "Any certificate as to the Net Asset Value per Share or as to the Subscription Price or Redemption Price therefor *given in good faith by or on behalf of the Directors* shall be binding on all parties" (the "Good Faith Provision"). *Id.* (emphasis added).

As the Funds had disclosed to prospective investors, Aug. 14, 2006 Private Placement Mem. (Dkt. 1595 at 59), the Directors appointed Citco as the Funds' "Administrator," Feb. 20, 2003 Administration Agreement ("Admin. Agreement") (Dkt. 963-3 at 3, 5); *see* Hare Decl. (Dkt. 925 ¶ 11). The Directors delegated to Citco, among other things, their authority to "redeem Shares in accordance with" the Articles, Admin. Agreement (Dkt. 963-3 at 7 (§ 3.4)), which included "calculation of the Net Asset

---

[3] The Articles provided that the NAV "shall be calculated at the time of each determination by dividing the value of the net assets of the Fund by the number of Shares then in issue," with certain adjustments. Articles (Dkt. 925-6 § 11(1)).

Value and the Net Asset Value per Share on a monthly basis in accord-ance with the Fund Documents," *id.* at 20 (Part 1(a)), and "publishing the Net Asset Value per Share … as requested by the Fund," *id.* at 21 (Part 2(e)).

Moreover, some Citco entities served as custodians and others pro-vided services to the Funds and controlled the day-to-day operation of the administrators, including issuance of NAV certificates.  Sept. 20, 2016 Proposed Second Am. Compl. ("<u>Am. Compl</u>.") (Dkt. 942 at 248 (¶¶ 68–70) (Molton Decl. Ex. C)).  Some Citco entities also served as registered hold-ers on behalf of some beneficial owner defendants, *id.* ¶ 68, and main-tained bank accounts for some of them in connection with their invest-ments in the Funds, Sept. 20, 2016 Fourth Am. Compl. (Dkt. 1595 at 218 (¶ 107) (Reply Molton Decl. Ex. E)).

## B.   Citco Fraudulently And Dishonestly Determined The Funds' Net Asset Values

In 2014, the Liquidators obtained evidence of fraud and dishonesty in addition to Madoff's Ponzi scheme:  Citco determined and certified NAVs based on BLMIS's stated returns despite Citco's own grave doubts

that the Funds' assets at BLMIS even existed.  *See* Oct. 21, 2016 Liqui-dators' Mot. to Amend ("Mot. to Amend") (Dkt. 933 at 7).

As early as 2000, Citco could not verify the existence of the Funds' assets at BLMIS, and Citco's employees expressed serious concerns whether the Funds' treasury bond transactions matched the transactions reported by Madoff—the "rhythm of trading" in Sentry's portfolio appeared too consistent to be true.  Am. Compl. (Dkt. 942 at 240 (¶ 44)). That year, Citco Group's head of internal audit, Ruud Bodewes, raised concerns to the general counsel and manager of Citco Bank Nederland N.V. Dublin Branch (which acted as the Funds' custodian) that Citco was blindly relying on BLMIS's accounts that Citco could not verify.  *Id.* at 240–41 (¶¶ 45–46).  Citco's head of internal audit for its administrator entities, Ger Jan Meijer, raised to the Citco Group's CEO, Christopher Smeets, that Citco had a legal obligation to obtain further assurance that the Funds' assets existed, *id.* at 241 (¶¶ 46–47), and warned Bodewes that BLMIS could be a "Manhattan [Investment Fund fraud]"—a scheme in which a fund manager hid losses by sending false account statements to investors—"multiplied by a factor of five," *id.* at 241 (¶ 46).  But the matter was "put on the back burner and hushed."  *Id.* at 242 (¶ 48).

14

A year later, in 2001, Meijer's concerns about BLMIS remained un-solved.  He warned that "Citco ha[d] a risk exposure of more than USD3 billion," and that "[p]robably there are no options to restore this situation from a worst case scenario."  *Id.* at 242 (¶ 49).  He would "not change [his opinion] as long as [he *did*] *not see evidence that the portfolio exist*[*ed*]."  *Id.* (emphasis added).  Five months later, now in 2002, Meijer again explained to Bodewes that he did not believe things were "right," and that, while he had been "worried about this situation for 2 years (including the risk to the continued existence of Citco), … the same was not taken seriously by certain gentlemen."  *Id.*  Meijer was told by a member of the administrator's management to stop raising the issue, but he was assured that Citco would try to meet with Madoff to investi-gate.  *Id.* 243 (¶ 51).

On three separate occasions between May 2000 and December 2002, Citco tried to verify the existence of the Funds' assets at BLMIS— and failed each time.  *Id.* at 243–45 (¶¶ 52–56).  The Citco Group's exec-utive committee was so informed on December 27, 2002.  *Id.* at 244–45 (¶ 56).  Prior to the third attempt, Smeets received a memorandum from Bodewes that shared Meijers' concerns, noted uneasiness about BLMIS

auditors, and concluded that losses at BLMIS could be hidden, leaving Citco ultimately liable to the Funds' shareholders.  *Id.* at 244 (¶¶ 55–56).  Citco made no further effort to verify the existence of the Funds' assets until Madoff confessed in December 2008.  *Id.* at 245 (¶ 57).

At the same time, Citco acted to protect its own assets.  In 2004, when Citco learned that AIG had pulled its investments from BLMIS altogether, Citco canceled one of its credit facilities with the Funds.  *Id.* at 246 (¶ 61).  Smeets, the CEO, was kept informed of the concerns underpinning this decision.  *Id.*  Shortly thereafter, Citco's board of directors placed the companies' business with the Funds "under scrutiny" and decided to "close down all credit relationships [with the Funds] … to decrease [Citco's] exposure."  *Id.*

Yet, Citco neither withdrew from its position as the Funds' administrator, *id.* at 246–47 (¶¶ 62–63), nor sounded the public alarm, nor ceased to determine NAVs based on BLMIS's suspect returns.  Instead, in 2006, Citco negotiated for an 800% increase in its custodian fees, as a condition of continuing to do business with the Funds.  *Id.* at 246–47 (¶¶ 62–64).  Incredibly, this new fee was a percentage of the NAV that Citco determined on behalf of the Funds—the higher Citco calculated

the NAV, the higher its fees. *Id.* at 246–47 (¶¶ 63–64). While Citco for years had reason to doubt the existence of the Funds' assets, it continued to fraudulently and dishonestly certify inflated NAVs in order to receive fees directly tied to those determinations. *Id.* at 247–48 (¶¶ 64–69).

### C.   The BVI Redeemer Actions

After Madoff's fraud was revealed and the Funds were liquidated, the Liquidators filed several lawsuits in the BVI based on the same Articles at issue in this appeal (described above) but dealing with different redemption transactions than those at issue here (the "BVI Redeemer Actions"). *See Fairfield II*, 596 B.R. at 291–92 (Dkt. 1743 at 21–22).

In 33 suits filed in the BVI Eastern Caribbean Supreme Court (the "BVI Court") in 2009 and 2010, the Liquidators sought restitution of approximately $1.45 billion from 74 investors (the "BVI Defendants") who had redeemed Fund shares in late 2003 and 2004. Hare Decl. (Dkt. 925 ¶¶ 17–20). The Liquidators brought claims for unjust enrichment, seeking restitution of the redemption payments made based on mistake of fact—namely, that BLMIS's operation was a Ponzi scheme. Mar. 12, 2010 Statement of Claim (Dkt. 925-1 ¶¶ 9–11). Alternatively, the

Liquidators sought to set aside the redemptions based on mutual mistake. *Id.* ¶ 12.

In 2011, over the Liquidators' objections, the BVI Court granted certain BVI Defendants a trial on "preliminary issues" related to certification and good consideration. Hare Decl. (Dkt. 925 ¶¶ 24, 26). Factual questions—including any allegations regarding Citco—were not at issue. *Id.* ¶ 48. Indeed, factual questions were expressly carved out of the preliminary issues proceedings, preserving the Funds' right to later argue that those proceedings were not determinative in view of previously unknown facts. *Id.* & n.21.[4]

After the trial, the BVI Court held, in relevant part, that various transactional documents relating to NAVs that Citco issued to investors were not "certificate[s] as to the [NAVs]" within the meaning of

---

[4] In English and BVI practice, "preliminary issues" are usually discrete, potentially dispositive questions of law that might resolve a case without a full trial to determine facts. Hare Decl. (Dkt. 925 ¶ 23). The Liquidators opposed a preliminary issues trial given, *inter alia*, the enormous cost and delay of litigating those issues through appeal and the substantial risk the issues would not be dispositive without discovery and a determination of certain facts. *Id.* ¶¶ 26, 41. The Liquidators indicated that substantial discovery would be needed on factual issues in the preliminary issues proceedings, *id.* ¶¶ 27, 42, but the BVI Court's preliminary issues declaration expressly excluded factual issues, *id.* ¶ 48 & n.21.

Article 11(1). *Fairfield Sentry Ltd. (In Liquidation) v. Bank Julius Baer & Co.*, Nos. BVIHC (COM) 30/2010, et al. (Dkt. 963-2 at 11 (¶ 33)). Without certificates, the NAVs were not binding, *see id.* ¶¶ 17, 25, 37, but the Liquidators could not recover redemption payments based on those NAVs because the redeeming shareholders gave "good consideration" for the payments by surrendering their shares of the Funds. *Id.* ¶¶ 17, 34–37. In relevant part, the Eastern Caribbean Court of Appeal (the "ECCA") affirmed. *Quilvest Fin. Ltd. v. Fairfield Sentry Ltd. (in Liquidation)*, Nos. HCVAP 2011/041, et al. (Dkt. 963-2 at 78, 100-01, 103 (¶¶ 41, 87, 92)).

The Privy Council reversed on the issue of whether certificates as to the NAV existed based on the plain text of the Articles, holding that "certificates" *did* exist for the purposes of the Article 11(1). *Fairfield Sentry Ltd. (in Liquidation) v. Migani* [2014] UKPC 9 (Dkt. 925-17 ¶¶ 24–32 and Conclusion) ("*Migani*"). The result was that the NAVs were binding. *See* Articles (Dkt. 925-6 § 11(1)) (requiring that "certificate[s] as to the [NAVs]" exist in order for the NAVs to bind the parties).

The Privy Council's "starting point [was] the scheme of the Articles," which required redemption prices, based on the NAVs, to be set on specific Dealing Days and redemptions to be paid normally within

19

30 days thereafter.  *Migani* ¶ 21.  To ensure that this contractual mechanism functioned properly, and that NAVs were definitively set on Dealing Days, the Privy Council had two options for resolving the certificate issue.  It could either rule that (1) NAVs could be final without certificates, though that would be contrary to Article (11)(1), which requires certificates for NAVs to be binding; or (2) a "certificate" under Article 11(1) could be the "ordinary transaction documents" Citco provided to investors rather than "some special document issued at the discretion of the Directors"—thereby making the NAVs binding.  *Id.* ¶ 24.  Because "a provision for certification such as Article 11(1)[c] ha[d] been included as part of the mechanics of … redemption," the Privy Council concluded that "the correct approach [was] the second one."  *Id.*  Holding that the "ordinary transaction documents" were "certificates" for the purposes of Article 11(1), the Privy Council found the NAVs were binding and the Liquidators thus were not entitled to recover the corresponding redemption payments.  *Id.* ¶ 24 and Conclusion.

Importantly, "neither the BVI Court, the ECCA nor the Privy Council mentioned the good faith issue"—a central issue in the Bankruptcy Court and in this appeal—"and the issue was not actually decided."

20

*Fairfield II*, 596 B.R. at 293 (Dkt. 1743 at 24); *see also id.* at 289
(Dkt. 1743 at 16) ("Citco's alleged bad faith [was] a question that was not
raised or presented [in *Migani*]."); *id.* at 294 (Dkt. 1743 at 26) (same);
*Weavering II* ¶ 24 ("[*Migani*] does not address the question whether a
NAV would be considered to have been determined in accordance with
the articles if the directors themselves had fraudulently inflated the
value of the assets."). Because the Privy Council presumed the certifi-
cates had been given in good faith, it held the amount "properly due" had
been paid, and thus dismissed the appeal on the good consideration issue.
*See Migani* ¶¶ 18–19, 24 and Conclusion.[5]

### D.    The U.S. Redeemer Actions

Shortly after filing the BVI Redeemer Actions, but before the pre-
liminary issues proceedings in the BVI Court, the Liquidators

---

[5] Under BVI law, the doctrine of good consideration asks whether a pay-
ment made by mistake was nevertheless properly due to the payee. To
the extent it was properly due, it is not recoverable under a restitution
theory. *See generally* Graham Virgo, *Good Consideration Provided by the
Defendant*, The Principles of the Law of Restitution 189–91 (3d ed. 2015)
("Virgo"); Robert Goff & Gareth Jones, *Good Consideration*, The Law of
Unjust Enrichment 822–25 (9th ed. 2016) ("Goff & Jones").

commenced separate suits in New York.[6]  Mot. to Amend (Dkt. 933 at 8).
These suits, which in the aggregate seek the return of over $6 billion in
redemption payments, *id.* at 5, did not concern any of the redemption
transactions at issue in the BVI Redeemer Actions (collectively, the "U.S.
Redeemer Actions").[7]  Jan. 13, 2017 Defs.' Mot. to Dismiss ("Mot. to Dis-
miss") (Dkt. 960 at 22).

In all 303 U.S. Redeemer Actions, the Liquidators brought claims
for unjust enrichment, mistaken payment, money had and received, and
constructive trust (the "Common Law Claims"), generally on the same
theory of mistake of fact as in the BVI Redeemer Actions.  *Fairfield II*,
596 B.R. at 289 (Dkt. 1743 at 16–17).  In some of those U.S. Redeemer
Actions, despite a partial stay pending the outcome of, *inter alia*, appeals
of the BVI preliminary issues rulings, the Liquidators were permitted to

---

[6] The Liquidators commenced the BVI Redeemer Actions before identify-
ing the Funds' subscription agreements containing a New York forum
selection clause.  Mot. to Amend (Dkt. 933 at 10–11).

[7] Following the Bankruptcy Court's recognition of the Funds' BVI liqui-
dation proceedings as "foreign main proceedings" under Chapter 15, the
Liquidators' state court actions were removed to this Court, Mot. to
Amend (Dkt. 933 at 8–9), which referred all actions to the Bankruptcy
Court, which administratively consolidated them.  Nov. 17, 2010 Consol-
idation Order (Dkt. 25).

amend their complaints as of right to add claims for breach of contract and breach of the implied covenant of good faith and fair dealing (the "Contract Claims").  Mot. to Amend (Dkt. 933 at 13–14, 20).  Amending before *Migani*, and so relying on the ECCA's decision that NAV "certificates" *had not* been issued for purposes of Article 11(1), the Liquidators argued that the relevant NAVs were not binding and hence redeeming investors had to return their excess redemption payments.  Mot. to Amend (Dkt. 933 at 20–21).

In the summer of 2014, the Liquidators obtained evidence that Citco had not carried out its NAV-related duties in good faith—that Citco suspected BLMIS was a fraudulent scheme as early as 2000 but turned a blind eye and continued determining NAVs based on Madoff's phony returns.  Molton Decl. (Dkt. 942 at 3 (¶ 5)); *see supra* Statement of Case Section B.

In light of this evidence and the Privy Council's ruling in *Migani* that NAV certificates *had* been issued (reversing the ECCA on that point), the Liquidators moved for leave to amend their claims to allege Citco had not issued those certificates in good faith.  Mot. to Amend (Dkt. 933 at 21).  For the Common Law Claims, the Liquidators asserted

23

that, because Article 11(1) required NAV certificates be "given in good faith," the NAV certificates issued by Citco in bad faith were not binding, hence the Liquidators could recover inflated redemption payments tied to those non-binding NAVs. *Id.* at 20–21, 31–34.

For Contract Claims in those actions which had been amended as a matter of right, the Liquidators asserted that (1) certificates issued in bad faith were not binding; and (2) Defendants breached an "implied term for repayment of any overpayments" by not returning redemption payments in excess of the true NAVs. *Id.* at 20–21, 34–35; Am. Compl. (Dkt. 942 at 273–75 (¶¶ 191–93, 196–99)). The Liquidators also sought to add those same claims to their other actions, in which they had not previously asserted the Contract Claims. Mot. to Amend (Dkt. 933 at 21).

Defendants-Appellees opposed the Liquidators' motion for leave to amend and simultaneously moved to dismiss the Common Law and Contract Claims. Notice Mot. to Dismiss (Dkt. 959).[8]

---

[8] Defendants-Appellees also moved to dismiss the Liquidators' BVI statutory avoidance claims, which are not at issue in this appeal. Mot. to Dismiss (Dkt. 960 at 50–58, 75–84).

### E.    The Decision Below

On December 6, 2018, the Bankruptcy Court denied leave to amend the Common Law Claims, with one exception.  Applying its understanding of English and BVI law,[9] the court dismissed all Common Law Claims except those brought against defendants who allegedly knew the NAVs were inflated at the time of redemption.  It did so on two grounds.

*First*, the court relied on *Migani* and its progeny, most notably the Cayman Islands Court of Appeal's 2016 decision in *Skandinaviska Enskilda Banken AB (Publ) v. Conway (as Joint Official Liquidators of Weavering Macro Fixed Income Fund Ltd.)* [2016] CICA No. 2 of 2016 ("*Weavering I*"), and the Privy Council's 2017 decision in *DD Growth Premium 2X Fund (In Official Liquidation) v. RMF Mkt. Neutral Strategies (Master) Ltd.* [2017] UKPC 36 ("*DD Growth*").  *See Fairfield II*, 596 B.R.

---

[9] There is no dispute that BVI law applies to the substance of the Liquidators' claims.  "The availability of a claim for restitution arising out of a transaction governed by the Articles of the Fund is governed by the same law which governs the Articles themselves, namely the law of the British Virgin Islands."  *Migani* ¶ 17.  The principles of BVI law are, "[i]n every relevant respect … the same as those of English law."  *Id.*; *see also Fairfield II*, 596 B.R. at 290 n.19 (Dkt. 1743 at 18 n.19) ("The BVI is an autonomous British territory.  Although the BVI has its own legislation, its legal system is based on English law.").

at 300–01 (Dkt. 1743 at 29–31).  "*Migani*'s emphasis on finality, certainty[,] and workability," the Bankruptcy Court reasoned, meant that "[n]either fraud nor illegality nor breach of trust allows either side to revisit [a] redemption payment in the absence of bad faith by the redeeming shareholder."  *Id.* at 295 (Dkt. 1743 at 27).  Thus, it held, "once the Funds discharged their debts by making the redemption payments and the Defendants discharged their obligations by surrendering their shares, neither side could revisit the NAV based on hindsight" (the "Finality Holding").  *Id.* at 297 (Dkt. 1743 at 31).

*Second*, the Bankruptcy Court held in the alternative that Citco's bad faith itself barred the Liquidators from amending most of their Common Law Claims.  Although the Funds had delegated NAV determinations to Citco, the court concluded that "it is the Directors' good faith, not Citco's, that is relevant."  *Id.* at 298–99 (Dkt. 1743 at 33–34).  The court then imputed Citco's bad faith to the Directors, and thus to the Funds, and held that "the Funds [could not] rely on their own misconduct to recover the inflated redemption payments" (the "Bad Faith Holding").  *Id.* at 299 (Dkt. 1743 at 34–35).

26

The Bankruptcy Court also denied leave to amend the Contract Claims. It declined to imply a term in the Articles allowing the Funds to recover overpayments based on fraudulently or dishonestly inflated NAVs, holding that "[g]iven the interests [in finality] identified in *Migani*, it [was] neither obvious nor efficient nor consistent with the parties' expectations to imply that subscribers, redeemers or the Funds agreed to open-ended liability based on hindsight for incorrectly stated NAVs." *Id.* at 302 (Dkt. 1743 at 39). Instead, the Bankruptcy Court held the Articles "required" that the published NAVs be binding to avoid uncertainty—even if fraudulently or dishonestly determined. *Id.*

Finally, the Bankruptcy Court dismissed, in part, the unamended complaints for failure to state a claim, except that it did not dismiss Common Law Claims that alleged specific defendants knew at the time of the redemption payments that the NAVs were incorrect. *Id.* at 282, 301, 316. (Dkt. 1743 at 4, 38, 65). The Liquidators are in the process of filing amended complaints containing such claims. The Bankruptcy Court's ruling dismissed claims targeting the approximately $6 billion the Liquidators seek to recover in the U.S. Redeemer Actions, including the $1.9 billion not reached by any of their remaining claims.

27

## SUMMARY OF ARGUMENT

The primary issue on appeal is whether BVI law allows an investment fund's shareholders to keep redemption payments inflated by the fund's agent's fraudulent or dishonest determination of NAVs, or whether the fund's liquidators may recover such overpayments and equitably distribute them to all creditors.  In *Weavering II*, the Privy Council definitively answered this question:  NAVs determined based on a fund's internal fraud or dishonesty of its authorized agent are *not* binding, and fund liquidators must be able to recover inflated redemption payments based on such NAVs.

As controlling BVI law, *Weavering II* mandates reversal of the Bankruptcy Court's Finality Holding—the court's primary basis for partially denying leave to amend the Common Law Claims—which erroneously extended the Privy Council's decision in *Migani* to require that NAV determinations be treated as final, even if fraudulently or dishonestly determined, unless the redeeming shareholders knew the NAVs were inaccurate at the time of redemption.

*Weavering II* also requires reversal of the Bankruptcy Court's Bad Faith Holding—the court's alternative basis for its ruling on the Common

Law Claims—which imputed Citco's bad faith to the Funds and errone-ously held the Liquidators could not recover in the face of such bad faith. *Weavering II* held that imputation is irrelevant; the question is whether the NAVs were binding.  If they were not binding—including because of an agent's fraud or dishonesty—then BVI public policy requires courts to assist the fund's liquidators in recovering inflated redemption payments so they can equitably distribute that money to all fund creditors.

Even if *Weavering II* did not control, the Bankruptcy Court's Final-ity Holding still should be reversed.  The Good Faith Provision explicitly requires that certificates must be given in "good faith" for the NAVs to be binding—a key protection for investors—and, on its own, mandates that the fraudulent and dishonest NAVs here are not binding.  The Bank-ruptcy Court misread *Migani* as extending common law principles of fi-nality to trump the plain requirements of the Good Faith Provision in the face of a fund's agent's bad faith.  But, in *Migani*, the Privy Council did not endorse ignoring clear contract terms and it was never asked to con-sider Citco's bad faith.

Absent *Weavering II*, the Bankruptcy Court's alternative Bad Faith Holding should also still be reversed.  The Liquidators do not seek

recovery for the Funds' benefit; they seek recovery for the benefit of non-redeeming shareholders, who are the true victims of Citco's fraud and dishonesty—a recovery favored by English and BVI policy.  Moreover, under English and BVI law, there is not an unclean hands-type defense based on Citco (or the Directors) giving NAV certificates in bad faith because the Good Faith Provision explicitly provides that such bad faith certificates are not binding.

*Weavering II* also requires reversal of the Bankruptcy Court's denial of leave to amend the Contract Claims.  The court declined to imply a term in the Articles that would allow the Liquidators to recover fraudulent or dishonest overpayments because the court misread *Migani* as requiring that almost all redemption payments be final.  But *Weavering II* made clear that any need for finality in calculating NAVs "must yield" where, as here, NAVs are inflated by a fund's internal fraud or dishonesty.  Even absent *Weavering II*, moreover, the Bankruptcy Court's decision was erroneous:  The Good Faith Provision provides that NAVs determined in bad faith are *not* binding, hence the Articles must be read as allowing recovery; otherwise, the NAVs would in effect be binding.

Reversal of the Bankruptcy Court's denial of leave to amend the Common Law Claims and the Contract Claims warrants vacatur of the court's partial dismissal of the Liquidators' claims.  Consistent with the preferred course of district courts in this Circuit, this Court should remand with instructions to deny Defendants-Appellees' motions to dismiss those claims as moot.

The Liquidators respectfully request that this Court (1) reverse the Bankruptcy Court's decision to the extent that it denied leave to amend the Common Law Claims and the Contract Claims; (2) vacate the decision to the extent it dismissed any of those claims; and (3) remand with instructions that the Bankruptcy Court deny the motions to dismiss those claims as moot.

## ARGUMENT

### I.   *WEAVERING II* AUTHORIZES THE LIQUIDATORS' AMENDED COMMON LAW CLAIMS

*Weavering II* requires reversal of the Bankruptcy Court's ruling on the Common Law Claims.  In its Finality Holding, based on its misreading of *Migani* and its progeny, the court erroneously held that an interest in finality in determining NAVs precluded the Liquidators from recovering inflated redemption payments based on fraudulently or dishonestly

31

determined NAVs.  *Fairfield II*, 596 B.R. at 295–97, 301 (Dkt. 1743 at 27–31, 37–38).  With its Bad Faith Holding, the court erroneously held the Liquidators could not recover because (1) the Directors' good faith, not Citco's, was at issue; (2) Citco's bad faith should be imputed to the Directors and Funds; and (3) the Liquidators could not rely on the Funds' own imputed bad faith as a basis to recover inflated redemption payments.  *Id.* at 298–99 (Dkt. 1743 at 33–35).

Ruling after the Bankruptcy Court's decision, the Privy Council squarely held in *Weavering II* that NAVs based on an internal fraud or dishonesty by a fund's agent with actual authority to determine the NAVs—as alleged here—are not binding.  *Weavering II* ¶¶ 26–27.  It further held that whether the agent's misconduct could be imputed to the fund is irrelevant:  Because the NAVs were fraudulently and dishonestly determined, they were not binding.  *Id.*  *Weavering II* also made clear that public policy requires that fund liquidators be able to recover such inflated redemption payments to rectify redeeming investors' unfair advantage over non-redeemers.  *Id.* ¶¶ 80, 111, 124.

*Weavering II* controls here.  Privy Council decisions are controlling law on the BVI legal issues before the Bankruptcy Court.  *See* Mot. to

Dismiss (Dkt. 960 at 17–18). And this Court must apply intervening changes in controlling law. *See Vandenbark v. Owens-Illinois Glass Co.*, 311 U.S. 538, 541 (1941) (controlling law decided during the time an appeal has been pending must be applied by the reviewing court). Accordingly, this Court should reverse, *id.* at 543; *Troice v. Proskauer Rose, LLP*, 816 F.3d 341, 348, 350 (5th Cir. 2016), or at least vacate and remand, *see Rogers v. White Metal Rolling & Stamping Corp.*, 249 F.2d 262, 265 (2d Cir. 1957); *City of Pontiac Gen. Emps.' Ret. Sys. v. MBIA, Inc.*, 637 F.3d 169, 173, 176–77 (2d Cir. 2011).

## A. Under *Weavering II*, Net Asset Values Determined Fraudulently Or Dishonestly By An Investment Fund's Authorized Agent—As Here, By Citco—Are Not Binding

In *Weavering II*, the Privy Council held that inflated NAVs issued pursuant to a fund's internal fraud or dishonesty cannot be contractually binding. Because Citco's fraud and dishonesty—constituting bad faith[10]—were internal to the Funds, the NAVs at issue cannot be contractually binding.

_____

[10] The English and BVI standard for bad faith turns on whether a person acted (1) "[k]nowing that what he was doing was wrongful"; (2) "[s]uspecting that what he was doing was wrongful but deliberately not taking

In *Weavering II*, after a Cayman-based fund made redemption payments, its directors learned that the fund's manager—to whom the directors had "delegated authority, including authority in relation to redemption payments"—had fraudulently determined the fund's NAVs. *Weavering II* ¶ 24; *see also id.* ¶¶ 5, 11.   The fund's liquidators sued the redeeming investors, asserting that the redemption payments were invalid under a Cayman statute as unlawful preferences over other creditors. *Id.* ¶ 2.   The redeeming investors countered that the payments fell outside the statute because the fraudulent NAVs were not binding, hence the investors had never been the fund's "creditors" and so were not subject to a statutory preference claim. *Id.* ¶ 16(a).   The Privy Council agreed, holding that the fund, through its manager, had breached an implied duty to act in good faith and therefore "the [internal] dishonest valuation of

---

steps to check the position in order to avoid having his suspicions confirmed," otherwise known as willful blindness; and (3) recklessly, with indifference "as to whether or not what he was [d]oing was wrongful or lacking any belief that what he was doing was right."   Oct. 20, 2016 Decl. of Gabriel Moss QC ("Moss Decl. I") (Dkt. 926 (¶ 41)); *see also Three Rivers Dist. Council v. Bank of England (No. 3)* [2003] 2 A.C. 1 (HL) at 191–92, 230.   The same criteria also establish fraud and dishonesty. *See Derry v. Peek* [1889] 14 App. Cas. 337 (HL) at 374 (fraud); *Royal Brunei Airlines v. Tan* [1995] 2 A.C. 378 (PC) at 389–90 (dishonesty).

assets was … not 'binding.'"  *Id.* ¶ 27.  Even if the *Weavering II* fund's articles in that case had purported to make fraudulent or dishonestly calculated NAVs binding, the Privy Council held that "such a fraudulent determination could not bind redeeming shareholders." *Id.*[11]

On this point, *Weavering II* expressly reversed *Weavering I*.  In *Weavering I*, the Cayman Island Court of Appeal held that there is "no difference between an internal and an external fraud in terms of the binding nature of a NAV: the whole scheme of the Company's articles requires its business to be conducted on the basis that the NAV is binding, whether it is accurate or not." *Weavering I* ¶ 29.  In *Weavering II*, while the Privy Council acknowledged the importance of definitively

---

[11] Though *Weavering II* dealt with statutory unlawful preference claims, the Privy Council determined that common law restitution governed the recovery for such preferences under the statute, which did not itself provide for a remedy.  *See Weavering II* ¶¶ 74–81.  The Privy Council also held that a party seeking to avoid the NAVs would have to bring suit, notify those who would be affected, and agree to return any overpayments.  *Id.* ¶ 30.  Because the redeeming shareholders (who opposed restitution on grounds the NAVs were not binding) had not done so, they could not seek to avoid the NAVs.  In any event, they had been *overpaid*. *Id.*  Here, to the extent relevant, the Liquidators have done what *Weavering II* said was required:  They have sued the relevant redeeming shareholders, notified all shareholders, and seek to distribute all overpayments to the relevant creditors.

determining NAVs at the time of redemption, it held that "even this must yield where, as here, the fraud is internal to the company which is seeking to rely on the contract.  Fraud is something apart."  *Id.* ¶ 27.

*Weavering II* also made clear that the Privy Council's prior decision in *Migani* does not extend to cases involving *internal* fraud or dishonesty in calculating NAVs.  Because the issue of Citco's bad faith was not (and could not have been, *see supra* note 4) raised in *Migani*, the Privy Council presumed (without deciding) in *Migani* that "the redemption liabilities were determined by the directors in good faith, as the articles required." *Weavering II* ¶ 24.  The only fraud considered in *Migani* was Madoff's, which "was external to the fund," unlike the fraud of the manager in *Weavering II*, which "[could not] be considered external."  *Id.*

The Privy Council considered *Migani* "distinguishable" because "[*Migani*] [did] not address the question whether a NAV would be considered to have been determined in accordance with the articles if the directors themselves had fraudulently inflated the value of the assets"—that is, if the fraud or dishonesty in valuing the NAVs had been internal.  *Id.* *Weavering II* answered that question:  Where the fund's directors expressly delegated their powers to an agent, and the agent's fraud or

dishonesty breached the fund's "duty under the contract to act in good faith," then the fraud or dishonesty was "internal" such that the fraudulently or dishonestly determined NAVs were not binding. *Id.* ¶ 27.

*Weavering II* requires reversal of the Bankruptcy Court's holding that principles of finality supposedly require that the NAVs here be binding despite Citco's bad faith. *Weavering II* makes clear that NAVs determined based on a fund's internal fraud or dishonesty (as here) are *not* binding, regardless of finality concerns. As in *Weavering II*, the Directors here gave Citco actual authority to determine the NAVs and to control the redemptions, making Citco's conduct internal. Admin. Agreement (Dkt. 963-3 at 20 (Part 1(a)), 7 (§ 3.4)).[12] Even *Defendants-Appellees' BVI law expert conceded* that Citco's alleged misconduct should be considered fraud and dishonesty "internal" to the Funds, unlike the "external" Madoff fraud. Jan. 13, 2007 Decl. of Simon Mortimore, QC ("Mortimore Decl.") (Dkt. 962 ¶ 74 (describing the BLMIS fraud as "external to the

---

[12] In noting that the manager in *Weavering II* had actual authority to carry out the valuations, *Weavering II* ¶ 26, the Privy Council observed that this manager was therefore the "controlling mind in the payment of the relevant redemptions" of the fund. *Id.* ¶ 25. Here, because the Directors gave Citco actual authority to determine the NAVs, Citco was the "controlling mind" of those determinations.

Funds," and the "alleged bad faith of Citco, [the Directors'] agent," as "fraud … internal to them"—that is, to the Funds)).

In BVI law, bad faith is synonymous with fraud and dishonesty. *See Weavering II* ¶¶ 24, 27; *Derry v. Peek* [1889] 14 App. Cas. 337 (HL) at 374; *Royal Brunei Airlines v. Tan* [1995] 2 A.C. 378 (PC) at 389–90 (Lord Herschell); *Three Rivers Dist. Council v. Bank of England (No. 3)* [2003] 2 A.C. 1 (HL) at 191–92 (Lord Steyn), 230 (Lord Hobhouse).  By alleging that Citco suspected Madoff and BLMIS of fraud but turned a blind eye, the Liquidators contend that Citco acted with willful blindness or (at minimum) recklessly, and so state a claim for bad faith under BVI law. *See* Moss Decl. I ¶ 41.  Because fraudulently or dishonestly determined NAVs are not binding, common law permits the Liquidators to seek to reclaim inflated payments based on such NAVs.  *Weavering II* ¶¶ 27, 80, 111, 124.

This Court should reverse the Bankruptcy Court's decision and hold that the Liquidators sufficiently stated a claim that Citco determined the NAVs in bad faith—it should not simply vacate for further proceedings as to the allegations' sufficiency.  This Court may do so based on any one of four independent grounds: (1) the Liquidators' allegations raise a

38

purely legal issue that requires no additional factfinding, *Baker*, 239 F.3d at 420; (2) vacating and remanding, instead of simply reversing, would waste judicial resources by inviting additional motion practice and appeals on a legal issue that could be resolved now, in a case that has already spanned a decade but not proceeded past the pleading stage, *see Bacolitsas*, 702 F.3d at 681; (3) Defendants-Appellees would suffer no prejudice from reversal, as they had a full opportunity to attack the sufficiency of the allegations of Citco's bad faith in moving to dismiss regardless of *Weavering II*, *Davis*, 821 F.3d at 246; and (4) Defendants-Appellees challenged the sufficiency of the bad faith allegations below, *id.*; *see* May 26, 2017 Defs.' Mot. to Dismiss Reply Mem. (Dkt. 1457 at 46–47).

### B. Under *Weavering II*, BVI Common Law Authorizes The Liquidators To Recover Inflated Redemption Payments Based On Citco's Fraudulent And Dishonest NAV Determinations For The Benefit Of All Creditors

*Weavering II* also eviscerates the Bankruptcy Court's alternative Bad Faith Holding—that only the Directors' good faith is relevant, Citco's bad faith is imputed to the Directors and the Funds, and the Funds cannot now "rely on" their "own misconduct" to recover the redemption payments. *Fairfield II,* 596 B.R. at 298–300 (Dkt. 1743 at 33–35).

39

First, in *Weavering II*, the Privy Council held that whether the manager's fraud or dishonesty should be imputed to the fund was irrelevant: "[The court] is not concerned here with attributing knowledge. What matters in this case is that valuations were prepared on a fraudulent basis by the person to whom the directors had given actual authority to carry out the valuations." *Weavering II* ¶ 26; *see also id.* ¶ 27 (alternatively describing the valuation of assets as "dishonest"). That the fraud or dishonesty was internal to the fund does not bar recovery. Because the NAVs were fraudulently and dishonestly determined by a fund's agent with actual authority to calculate those NAVs and make redemption payments, they were not determined in good faith pursuant to the requirements of the articles, and thus could not be binding—regardless of any imputation. *Id.* ¶¶ 26–27.

Next, *Weavering II* made clear that English and BVI law requires redeeming investors to return inflated redemption payments based on a fund's internal fraud or dishonesty, and thus permits a fund's liquidators to seek restitution of such overpayments so they can equitably redistribute the money to the fund's creditors. The Privy Council explained that "the law requires the repayment of the money to the liquidators" to avoid

40

the "injustice" of redeeming investors "benefiting from the [over]payment at the expense of the [fund's] creditors." *Id.* ¶ 80. In such cases, restitution is "necessary to complete the process of undoing the unfair advantage" that redeemers obtained at non-redeemers' expense. *Id.* Thus, "[t]he common law therefore imposes an obligation on [the redeeming shareholder] to repay the money, with a corresponding right to rank as a creditor for the amount owed to it … upon repayment." *Id.*

The Privy Council then distinguished ordinary restitution actions from restitution actions brought by fund liquidators on behalf of harmed investors (like the Liquidators' claims here). Ordinary actions simply balance the private interests of two parties; but when liquidators act on behalf of harmed investors, they serve the public interest in protecting creditors. In the former situation, "it is the private interests of the two parties which are mainly in issue, and the equitable considerations requiring the benefit to be returned to the plaintiff can be cancelled out by equitable considerations arising from a change of position on the part of the defendant." *Id.* ¶ 111. In the latter situation, as here, a "liquidator's claim is brought in order to give effect to a statutory scheme which has

been enacted by the legislature mainly in the public interest for the protection of creditors as a class." *Id.*

Finally, in light of these considerations, *Weavering II* held that a fund's internal fraud or dishonesty was not a reason to deny the liquidators recovery of inflated redemption payments at common law; it was a reason to allow them to pursue those recoveries. The guilt of the fund's authorized agent "[did] not render illegal the liquidators' attempts to recover payments made unlawfully in the lead up to the insolvency." *Id.* ¶ 124. To the contrary, the liquidators were discharging an affirmative "legal duty to recover moneys owed properly to the [fund] and distribute these according to law among … creditors." *Id.* Thus, the liquidators' cause of action was "not founded on an illegal act but rather [was meant] to redress the unlawful acts of paying out to some creditors in preference to others." *Id.* Importantly, the Privy Council commended courts to "assist the liquidators" in doing so, noting that "[t]here is no public policy reason to the contrary in favour of [redeeming shareholders]." *Id.*

Under this controlling law, the Bankruptcy Court's alternative Bad Faith Holding cannot survive. Here, as in *Weavering II*, the Funds gave an agent, Citco, actual authority to determine the relevant NAVs.

42

Whether Citco's fraud and dishonesty can be imputed to the Directors is irrelevant; what matters is that Citco did not determine the NAVs in good faith, hence those NAVs are not binding. *See id.* ¶¶ 26–27. English and BVI law requires the redeeming investors to return the overpayments they received and allows the Liquidators to reclaim those funds so they can equitably distribute them to the Funds' creditors, acting in the public interest. *Id.* ¶¶ 80, 111, 124. As in *Weavering II*, the Liquidators are trying to redress the improper payments through their Common Law Claims, and "the courts should assist the liquidators in doing this." *Id.* ¶ 124. Here, where the overpayments resulted from the Funds' internal fraud and dishonesty, the Court should allow the Liquidators to amend their complaints.

### C.   Even If *Weavering II* Did Not Control, The Bankruptcy Court Erred In Partially Denying The Liquidators Leave To Amend Their Common Law Claims

Even if *Weavering II* did not control (it does), the Bankruptcy Court's rulings were still erroneous and must be reversed. In its main Finality Holding, the court erroneously misread *Migani* as imposing a common law rule that requires all NAVs be final in all cases, including bad faith. In truth, *Migani* held the Articles' text and structure required

43

that transaction documents be considered final "certificates" under Article 11(1)—endorsing a text-based approach to contract interpretation.  In its alternative Bad Faith Holding, the Bankruptcy Court held that (1) only the Directors' good faith was relevant, not Citco's; (2) Citco's bad faith was imputed to the Directors; and (3) the Funds could not recover in the face of this imputed bad faith.  But under the Articles' Good Faith Provision, Citco's bad faith is dispositive, as it was the authorized giver of the NAV certificates, and English and BVI public policy strongly supports recovery to compensate the non-redeeming shareholders, who are the true victims of Citco's bad acts.

### 1. Under The Plain Language Of The Funds' Articles, Net Asset Values Determined In Bad Faith Are Not Binding

The Bankruptcy Court violated English and BVI rules of contract interpretation when it nullified the Good Faith Provision.  It is a core principle of English and BVI contract law that "[t]he court's task is to ascertain the objective meaning of the language which the parties have chosen to express their agreement."  *Wood v. Capita Ins. Servs. Ltd.* [2017] UKSC 24, ¶ 10.  The natural meaning of the language best assists the court in "identifying what the parties meant."  *Arnold v. Britton*

[2015] UKSC 36, ¶ 17.  The importance of relying on the text is especially pertinent where—as here—the contract is "sophisticat[ed]," "complex[]," and was "negotiated and prepared with the assistance of skilled professionals."  *Wood* ¶ 13; *see also Attorney General v. River Dorée Holdings Ltd.* [2017] UKPC 39, ¶ 51 ("[T]he most modern restatement of the principles of contractual interpretation is to be found in the recent cases in the Supreme Court of *Arnold* … and *Wood*.").

By its plain terms, the Good Faith Provision states a NAV determination is not binding unless a NAV certificate has been provided in good faith.  *See* Articles (Dkt. 925-6 § 11(1)).  If a NAV certificate is not "given in good faith," then a NAV determination cannot be binding—just as a NAV determination could not be binding if no certificate were provided or if one were provided by someone other than the Directors or a person acting on their behalf.

The Bankruptcy Court erroneously disregarded the Articles' plain language because it believed *Migani* set forth broad "common law principles" of "finality, certainty[,] and workability" in determining NAVs.  *Fairfield II*, 596 B.R. at 295 (Dkt. 1743 at 27).  In the court's telling, these common law principles "require[d]" it to reject the Liquidators' claims,

45

"even where the NAV was the product of fraud or the redemption payment was illegal," unless a Defendant knew the NAV was inflated at the time of redemption. *Id.* Using these principles, the court effectively rewrote Article 11(1) to eliminate the "good faith" language.

In fact, *Migani* was not based primarily on common law principles; it was based on the Articles' text and structure: "The starting point [was] the scheme of the Articles." *Migani* ¶ 21. The Articles' contractual scheme both "depend[ed] upon the [redemption] price being definitively ascertained by the Dealing Day and known to the parties shortly thereafter," *id.*, and also provided a NAV could not be final and binding unless it was certified. To ensure that the Articles' mechanics functioned, the Privy Council read the term "certificate" in Article 11(1) broadly to include the "ordinary transaction documents" that Citco had provided to the investors, "not [as] some special document issued at the discretion of the Directors." *Id.* ¶ 24. Otherwise, the Privy Council would have needed to hold that NAVs could be binding without certificates, which would have violated the Articles' plain text.

The issue of Citco's good faith was not before the Privy Council in *Migani*. The court presumed (without deciding) that "the redemption

46

liabilities were determined by the directors in good faith, as the articles required." *Weavering II* ¶ 24.  Thus, it would have been *impossible* for the Privy Council to have held in *Migani* that the common law required redemptions based on bad faith NAVs be binding despite plain contractual language to the contrary.  While *Migani* discussed the importance of finality, it held the Articles' text and structure compelled that transaction documents be considered final "certificates."[13]  The Bankruptcy Court's reading of *Migani* as negating the Articles' plain language was error.[14]

---

[13] *Migani*'s author endorses the "primacy of language in the interpretation of contracts."  *See* Lord Jonathan Sumption, *A Question of Taste: The Supreme Court and the Interpretation of Contracts*, Harris Society Annual Lecture, Keble College, Oxford 9 (May 8, 2017).

[14] The Bankruptcy Court's discussion of *Migani*'s progeny was also flawed.  *First*, the court mischaracterized *DD Growth* as holding that NAVs based on false information are binding, 596 B.R. at 296–97 (Dkt. 1743 at 29–31); in fact, the parties there *conceded* the NAVs were binding even though based on false information, *DD Growth* ¶ 28, but the Liquidators make no such concession here.  (Notably, the Bankruptcy Court distinguished another case, *Kingate Global Fund Ltd. (In Liquidation) v. Kingate Mgmt. Ltd.* [2015] SC (Bda) 65 Com. on grounds the parties there had conceded false NAVs would not be binding.  *See* 596 B.R. at 300 (Dkt. 1743 at 36–37)).  *Second*, the court cited *Weavering I* for the proposition that subsequently discovered fraud does not invalidate a NAV or corresponding redemption payments, 596 B.R. at 296 (Dkt. 1743 at 29–39); but *Weavering II* overruled *Weavering I* on this point and, in any event, *Weavering I* did not let the overpaid redeemer keep its windfall, *Weavering I* ¶¶ 60, 65–66.  *Finally*, the court cited *Pearson v. Primeo*

The Bankruptcy Court further erred to the extent it rewrote the Articles to neutralize the Good Faith Provision based on any external considerations of commercial reasonability. English law looks beyond the contract's language to commercial common sense only in limited situations that are not present here—for example, where a contract term is subject to "rival constructions," or can be characterized by its "informality, brevity[,] or the absence of skilled professional assistance." *Wood* ¶¶ 11, 13.[15]  The Good Faith Provision has only one reasonable, unambiguous interpretation—if the NAVs were not certified in good faith, they are not binding—so there is no reason to "depart from the [contract's]

_____

*Fund* for the proposition that finality interests similarly prevail, 596 B.R. at 295–96 (Dkt. 1743 at 27, 29); in fact, *Pearson* decided that redeeming shareholders had priority over non-redeeming shareholders and did not consider whether fraudulently inflated NAVs could be binding, [2017] UKPC 19, ¶ 21.

[15] Courts applying English law make clear that though a contract may become a poor bargain, "it is not the function of the court to improve their bargain." *Wood* ¶ 41.  For example, the *Arnold* Court enforced a compounding service charge rate resulting in a 611,011% increase by the contract's end.  *Arnold* ¶ 30; *see also, e.g.*, *Carillion Constr. Ltd. v. Emcor Eng'g Servs. Ltd.* [2017] EWCA (Civ) 65 ¶¶ 47, 53 (a party's receipt of a "windfall benefit … is no reason to depart from the natural meaning of the words which they used or adopted"); *Balfour Beatty Reg'l Constr. Ltd. v. Grove Devs. Ltd.* [2016] EWCA (Civ) 990 ¶ 39 ("The court will not, indeed cannot, use the canons of construction to rescue [that] party from the consequences of what that party has clearly agreed.").

natural meaning." *Carillion Constr. Ltd. v. Emcor Eng'g Servs. Ltd.* [2017] EWCA (Civ) 65, ¶ 53; *Trillium (Prime) Prop. GP Ltd. v. Elmfield Road Ltd.* [2018] EWCA (Civ) 1556, ¶¶ 15, 18 (rejecting party's argument that "something had gone wrong" with the language of a clause where contract had been professionally drafted and party failed to think through the clause's consequences); *Balfour Beatty Reg'l Constr. Ltd. v. Grove Devs. Ltd.* [2016] EWCA (Civ) 990, ¶¶ 38–39 (same).[16]

But even if the Good Faith Provision were subject to an alternate interpretation (it is not), and the Bankruptcy Court thus had to consider commercial common sense (it did not), the Bankruptcy Court should have recognized that commercial common sense only confirms the Liquidators' interpretation of that provision. If a NAV is fraudulently or dishonestly overstated (as here), the "good faith" requirement protects the non-redeeming shareholders who would otherwise be economically punished

---

[16] Moreover, the Articles warrant a heavy interpretive focus on the text, as they (1) are a formal legal document prepared by skilled legal drafters; (2) are not the product of commercial negotiation between parties with conflicting interests; (3) are designed to operate in the long term; (4) confer important rights on parties that may have subscribed many years after the Articles were put into place; and (5) govern shareholders who may not have necessarily had easy access to expert legal advice. *See Barnardo's v. Buckinghamshire* [2018] UKSC 55, ¶ 14.

simply for failing to redeem soon enough.  The soundness of this approach is confirmed by the English and BVI public policy of compensating the "true victims of the wrongdoing."  *See* Lincoln Caylor & Martin S. Kenney, In Pari Delicto *and* Ex Turpi Causa*: The Defence of Illegality – Approaches Taken in England and Wales, Canada and the US*, 18 Bus. L. Int'l 259, 265 (2017) ("<u>Caylor & Kenney</u>"); *see also Weavering II* ¶¶ 80, 111, 124.  The requirement is also even-handed:  If the NAV had been fraudulently or dishonestly *understated*, then redeeming shareholders like Defendants-Appellees would undoubtedly claim its protection in order to compensate their undervalued return on investment.  If the Bankruptcy Court found the "good faith" condition to be anything less than commercially reasonable, it erred.

### 2.   The Liquidators May Recover Inflated Redemption Payments Based On Non-Binding, Bad Faith Net Asset Values To Benefit The Funds' Non-Redeeming Shareholders

Even if *Weavering II* did not control (it does), the Bankruptcy Court's alternative Bad Faith Holding for partially denying leave to amend the Common Law Claims cannot stand.  That holding provided that (1) one looks at only the Directors' good faith, not Citco's; (2) Citco's

50

bad faith should be imputed to the Directors and hence the Funds; and (3) the Funds could not rely on their own lack of good faith to recover. *Fairfield II*, 596 B.R. at 298–99 (Dkt. 1743 at 33–35).

The Bankruptcy Court erred at the threshold by holding that it was the Directors' good faith that was relevant on the sole basis that Article 11(1) requires that NAVs "shall be determined by the Directors." *Id.* at 298 (Dkt. 1743 at 34); Articles (Dkt. 925-6 § 11(1)).  Read in full, Article 11(1) provides that the relevant good faith is that of the certificate's *giver*:  "Any certificate … given in good faith by or on behalf of the Directors shall be binding on all parties."  Articles (Dkt. 925-6 § 11(1)).  Under this provision, the "good faith" requirement necessarily applies to the Directors or someone acting on their behalf—whichever entity actually gives the certificates.[17]  If the requirement applied to only the Directors,

---

[17] *See Flores-Figueroa v. United States*, 556 U.S. 646, 650, 652 (2009) ("As a matter of ordinary English grammar," a modifier applies to all subsequently listed items.); *Series-qualifier canon*, Black's Law Dictionary (11th ed. 2019) ("The presumption that when there is a straightforward, parallel construction that involves all nouns or verbs in a series, a prepositive or postpositive modifier normally applies to the entire series."); Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 147 (West 2012) ("In the absence of some other indication, the modifier reaches the entire enumeration.").

Article 11(1) would simply say that "Any certificate … given in good faith by the Directors shall be binding," but it does not.

The Bankruptcy Court's reading—that only the Directors' good faith matters—writes out the phrase "or on behalf of the Directors."  Under a plain reading of the Good Faith Provision, which gives full effect to that language, if an entity gives a certificate on the Directors' behalf, it must do so in good faith. Accordingly, the good faith of Citco, as the certificate's giver, is at issue, not the good faith of the Directors.  Looking to only Citco's lack of good faith, as the Good Faith Provision mandates here, ends the inquiry:  Citco did not certify the NAVs in good faith, so they cannot be binding.  Thus, the Liquidators are entitled to amend their Common Law Claims and seek recovery on that basis.

At its next step, the Bankruptcy Court mistakenly held that Citco's misconduct, which it imputed to the Funds,[18] barred the Liquidators from recovering the inflated redemption payments because doing so would purportedly allow the Funds' to take advantage of their "own

---

[18] For purposes of this appeal, the Liquidators do not contest the Bankruptcy Court's ruling that Citco's alleged bad faith can be imputed to the Funds.

misconduct." *Fairfield II*, 596 B.R. at 299 (Dkt. 1743 at 35).  In so holding, the Bankruptcy Court acted contrary to English and BVI public policy, which is "focused on identifying and compensating the 'true victim' of the wrongdoing," and on limiting the defense that a party may not take advantage of its own wrong.  Caylor & Kenney at 265; *see also supra* Section I.B (discussing *Weavering II*'s emphasis on compensating harmed shareholders outside of the context of a simple two-party dispute (citing *Weavering II* ¶¶ 80, 111, 124)).  Courts have applied this policy in the *ex turpi causa* context in situations of third-party facilitator liability.  Caylor & Kenney at 265; *see also Jetivia SA v. Bilta (UK) Ltd. (in liquidation)* [2015] UKSC 23, ¶¶ 202–09 (Lords Toulson & Hodge) (in *ex turpi causa* defense, public policy requires that rules of agent-principal attribution be flexible so as to compensate the party that was the ultimate victim).  And courts have applied the policy to find NAVs binding in order to allow liquidators to recover inflated redemption payments based on fraudulent or dishonest NAVs for the benefit of non-redeeming shareholders.  *See, e.g.*, *Weavering I* ¶¶ 60, 65–66.  The Bankruptcy Court should have applied that public policy in this case to find the NAVs were *not* binding and to

allow the Liquidators to recover inflated redemption payments on behalf of the Funds' creditors, including its non-redeeming shareholders.

Moreover, there is no universal rule under English and BVI law that a party may not recover in the face of its own wrong; rather, there "is a [contractual construction] presumption which will be rebutted if the agreement contains clear express provisions to the contrary." *Kingate* ¶ 160; Kim Lewison, *Party not to Take Advantage of Own Wrong*, The Interpretation of Contracts § 7.10 (6th ed. 2015) (because this principle "is one of construction rather than of law, [it] may be ousted by the express terms of the contract"); *see also* Mortimore Decl. ¶ 92 (Dkt. 962 ¶ 92).[19]  Here, even if the presumption applied, the parties deliberately

---

[19] In concluding "the Funds cannot rely on their own misconduct to recover the inflated redemption payments," the Bankruptcy Court cited *Kingate* ¶ 157 and *Weavering I* ¶ 29.  *Fairfield II*, 596 B.R. at 299 (Dkt. 1743 at 35).  *Kingate* stated generally that a party cannot take advantage of its own breach, *Kingate* ¶ 157, but then held parties may contract around that principle, *id.* ¶ 160, and concluded the parties had partially done so there, *id.* ¶ 162 (a clause that precluded liability absent "gross negligence, willful default, fraud, or dishonesty" contained a "clear, express provision" that the presumption would only apply in the enumerated circumstances).  In *Weavering I*, the appellate court asserted the general principle without any citation, and it did not preclude the liquidators from recovering in the face of the fund manager's fraud. *Weavering I* ¶¶ 29, 65–66.

contracted around it by expressly making good faith a condition precedent to the NAVs being binding—allowing the Funds to recover payments made based on bad faith NAVs.  Thus, regardless of whether Citco's bad faith is imputed to the Funds, the Articles still require Citco to have given a NAV certificate in good faith for a NAV to be binding.[20] Because there were no good faith certificates, the NAVs were not binding.

### 3.    There Are No Other Barriers To The Liquidators' Recovery

The Bankruptcy Court asserted in a footnote, without analysis, that (1) the Liquidators cannot dispute the NAV certificates were valid and genuine under Section 31 of the BVI Business Companies Act, 2004 (the "BCA"); (2) Defendants gave "good consideration" for their redemption payments; and (3) the Liquidators cannot restore Defendants-Appellees to the status quo. *Fairfield II*, 596 B.R. at 299 n.35 (Dkt. 1743 at 35 n.35). The court erred on all counts.

---

[20] Put another way, English and BVI law distinguishes between an agent's act that (1)  binds a principal in conducting its duties as a matter of agency law; and (2)  is a condition precedent to a principal's duties coming into existence under a contract.  March 30, 2017 Decl. of Gabriel Moss QC ("Moss Decl. II") (Dkt. 1338 ¶¶ 71–72).  This case is the latter scenario.

*First*, while the BCA prevents a company from disputing that documents issued on its behalf are valid or genuine, it does not prevent parties from separately agreeing via contract what makes a document *conclusive* or *binding* for purposes of the contract.  Moss Decl. II (Dkt. 1338 ¶¶ 78–80).  Here, while the NAV certificates may have been genuine to the extent that Citco actually issued them, that does not mean they were provided with the "good faith" required by the Articles to be binding on the parties under that contract.

*Second*, while the doctrine of "good consideration" provides that one cannot recover money paid by mistake if one actually owes it to the debtor, *Aiken v. Short* [1856] 1 H. & N. 210, this doctrine applies only "[s]o far as the payment exceeds the debt *properly due*."  *Migani* ¶ 18 (emphasis added); Virgo at 190.  Here, as the NAV certificates were not provided in good faith, the NAVs were not binding, so redemption payments of anything greater than a *de minimis* amount—the true value of the NAVs at all times—were not properly due.  Moss Decl. II ¶ 17.

*Finally*, where restoration of a non-monetary benefit is not possible, BVI law allows the plaintiff to pay money to the defendant to restore the equivalent of the status quo.  Goff & Jones at 835 (English common law

56

courts take a "more flexible approach," not insisting on "precise counter-restitution of non-money benefits"). Here, while the Liquidators cannot restore the redeemers' shares in the Funds, they can pay them the fair market value of those shares as of the time of redemption—near zero.

## II.   *WEAVERING II* AUTHORIZES THE LIQUIDATORS' AMENDED CONTRACT CLAIMS

The Bankruptcy Court's denial of leave to amend the Contract Claims cannot stand in light of *Weavering II*. The Liquidators sought to plead that Defendants-Appellees breached an implied term requiring the return of fraudulently and dishonestly inflated overpayments. Mot. to Amend (Dkt. 933 at 20–21, 34–35); Am. Compl. (Dkt. 942 at 273–75 (¶¶ 191–93, 196–99)). The Bankruptcy Court declined to imply such a term "[g]iven the interests identified in *Migani*" to avoid open-ended liability for redeeming investors. *Fairfield II*, 596 B.R. at 302 (Dkt. 1743 at 39).

In *Weavering II*, the Privy Council made clear that bad faith NAVs are not binding; the finality interests it identified in *Migani* "must yield where, as here, the fraud is internal to the company which is seeking to rely on the contract." *Weavering II* ¶ 27. *Weavering II* further clarified

57

that fund liquidators must be able to recover redemption payments inflated as the result of such internal fraud or dishonesty: "[R]estitution of the money to the assets available for distribution by the liquidators among the [fund's] creditors is necessary to complete the process of undoing the unfair advantage which [the redeeming investor] obtained at their expense." *Id.* ¶ 80.  It follows the Articles must be read as allowing the Liquidators to recover inflated overpayments based on fraudulent and dishonest NAVs.  *See Aspect Contracts (Asbestos) Ltd. v. Higgins Constr. Plc* [2015] UKSC 38, ¶ 24 (If an overpayment is established, then "by contractual implication or, if not, then by virtue of an independent restitutionary obligation, repayment must to that extent be required.").

Even absent *Weavering II*, the Bankruptcy Court's decision was flawed because it applied an outdated legal standard.  The court cited a Privy Council case for the proposition that courts imply contract terms only if those terms "would spell out in express words what the instrument, read against the relevant background, would reasonably be understood to mean." *Fairfield II*, 596 B.R. at 301–02 (Dkt. 1743 at 39) (quoting *Attorney General of Belize v. Belize Telecom Ltd.* [2009] UKPC 10).  A few years ago, the Supreme Court of the United Kingdom—whose

58

permanent judges are members of the Privy Council—clarified courts imply a contract term if it "is so obvious so as to go without saying or is required to give the contract 'business efficacy' or where the contract would lack 'commercial or practical coherence' without that term." Moss Decl. II (Dkt. 1338 ¶ 82) (quoting *Marks & Spencer plc v. BNP Paribas Secs. Servs. Tr. Co. (Jersey) Ltd.* [2015] UKSC 72, ¶ 21); Mortimore Decl. (Dkt. 962 ¶ 120) ("I agree with … Mr Moss … to the effect that a term may be implied in a company's articles if the proposed term is obvious or necessary on the grounds of business efficacy.").

Applying the current legal standard, the court should have implied a term allowing the Liquidators to recover inflated overpayments based on bad faith NAVs because the Articles would be incoherent without that term. *See, e.g.*, *Weavering II* ¶ 27 (implying a term of good faith into the Weavering fund's articles, the breach of which allowed liquidators' recovery of fraudulently or dishonestly inflated NAV payments). Article 11(1) provides that NAVs are not binding if a NAV certificate is not given in good faith. The Directors must be able to recover overpayments based on NAVs given in bad faith; if they could not, Article 11(1) would be meaningless because the NAVs would be binding as a practical matter (aside

59

from restitutionary remedies).  It is obvious, therefore, that the Articles must allow the Funds to recover redemption overpayments based on NAVs provided in bad faith.

## III.   BECAUSE THE LIQUIDATORS MAY AMEND THEIR COMPLAINTS, THE BANKRUPTCY COURT'S DISMISSAL OF THEIR PRIOR COMPLAINTS IS MOOT

Appellate courts have the authority to vacate a judgment granting a motion to dismiss and remand with instructions to deny the motion. *See, e.g.*, *Orlander v. Staples, Inc.*, 802 F.3d 289, 302 (2d Cir. 2015).  In the Second Circuit, a district court should dismiss as moot any motion to dismiss a complaint when it grants a plaintiff's motion to amend that complaint.  *See Williams v. N.Y. State Unified Court Sys. Office of Court Admin.*, No. 16-cv-2061 (VSB), 2017 WL 4402562, at *4 (S.D.N.Y. Sept. 30, 2017) (Broderick, J.) (noting the Court had previously granted plaintiff's motion for leave to amend and denied defendants' motion to dismiss as moot); *Joint Stock Co. v. Infomir LLC*, No. 16-cv-1318 (GBD) (BCM), 2017 WL 2988249, at *2 (S.D.N.Y. Mar. 27, 2017) (same); *Michael Miller Fabrics, LLC v. Studio Imports Ltd., Inc.*, No. 12-cv-3858 (KMW) (JLC), 2012 WL 4513546, at *3 (S.D.N.Y. Oct. 1, 2012) (same); *see also Roller Bearing Co. of Am. v. Am. Software, Inc.*, 570 F. Supp. 2d 376, 384 (D.

60

Conn. 2008) ("Where [a] proposed amendment requires leave of court, the preferred course it to grant leave to amend even if doing so renders moot the motion to dismiss, rather than granting the motion to dismiss and rendering moot the motion for leave.").

Here, once this Court reverses the Bankruptcy Court's partial denial of the Liquidators' motion to amend its Common Law Claims and Contract Claims, it should vacate the Bankruptcy Court's decision insofar as it granted the Defendants-Appellees' motions to dismiss those same claims and should remand with instructions for that court to deny those motions as moot.

## **CONCLUSION**

For the reasons provided, this Court should (1) reverse the Bankruptcy Court's decision to the extent that it denied leave to amend the Common Law Claims and the Contract Claims; (2) vacate the decision to the extent it dismissed any of those claims; and (3) remand with instructions that the Bankruptcy Court deny the motions to dismiss those claims as moot.

61

Date: December 10, 2019           Respectfully submitted,

                                              SELENDY & GAY PLLC

                                              */s/ David Elsberg*
                                              David Elsberg
                                              Caitlin J. Halligan
                                              Andrew R. Dunlap
                                              Lena Konanova
                                              Jordan Garman
                                              1290 Avenue of the Americas
                                              New York, NY 10104
                                              Telephone: 212-390-9000
                                              delsberg@selendygay.com
                                              challigan@selendygay.com
                                              adunlap@selendygay.com
                                              lkonanova@selendygay.com
                                              jgarman@selendygay.com

                                              -and-

                                              BROWN RUDNICK LLP
                                              David J. Molton
                                              Marek P. Krzyzowski
                                              Seven Times Square
                                              New York, NY 10036
                                              Telephone: 212-209-4800
                                              dmolton@brownrudnick.com
                                              mkrzyzowski@brownrudnick.com

                                              *Attorneys for the Plaintiffs-*
                                              *Appellants Foreign*
                                              *Representatives*

## **CERTIFICATE OF COMPLIANCE**

This document complies with the type-volume limitations of Federal Rule of Bankruptcy Procedure 8015(a)(7)(B) and the Court's Individual Rules & Practices in Civil Cases 5(c) because, excluding the parts of the document exempted by Federal Rule of Bankruptcy Procedure 8015(g), this document contains 12,998 words.

This document complies with the typeface requirements of Federal Rule of Bankruptcy Procedure 8015(a)(5) and the type-style requirements of Federal Rule of Bankruptcy Procedure 8015(a)(6) because this document has been prepared in a proportionally spaced typeface using Word for Office 365 64-bit and is set in Century Schoolbook, 14-point font.

Date: December 10, 2019          Respectfully submitted,

SELENDY & GAY PLLC

*/s/ David Elsberg*
David Elsberg

*Attorneys for the Plaintiffs-Appellants Foreign Representatives*